1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11   DARLA LUGO,                    )
                                    )
12                    Plaintiff,    )
                                    )     No.  CV-07-3068-HU
13        v.                        )
                                    )
14   MICHAEL J. ASTRUE,             )
     Commissioner of Social        )     FINDINGS & RECOMMENDATION
15   Security,                      )
                                    )
16                    Defendant.    )
     ───────────────────────────────)
17
     Phil Studenberg
18   Attorney at Law
     200 Pine Street
19   Klamath Falls, Oregon 97601

20        Attorney for Plaintiff

21   Karin J. Immergut
     UNITED STATES ATTORNEY
22   District of Oregon
     Britannia I. Hobbs
23   ASSISTANT UNITED STATES ATTORNEY
     1000 S.W. Third Avenue, Suite 600
24   Portland, Oregon 97204-2902

25   / / /

26   / / /

27   / / /

28   / / /

1 - FINDINGS & RECOMMENDATION

Terrye Shea
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

    Attorneys for Defendant

HUBEL, Magistrate Judge:

    Plaintiff Darla Lugo brings this action for judicial review of
the Commissioner's final decision to deny disability insurance
benefits (DIB) and supplemental security income (SSI).  This Court
has jurisdiction under 42 U.S.C. § 405(g).  I recommend that the
Commissioner's decision be affirmed.

PROCEDURAL BACKGROUND

    Plaintiff applied for DIB and SSI on February 13, 2004,
alleging an onset date of October 15, 1990.  Tr. 54-56, 466-69.
Her applications were denied initially and on reconsideration.  Tr.
21-22, 30-34, 470-75, 476-79.

    On April 6, 2007, plaintiff, represented by counsel, appeared
for a hearing before an Administrative Law Judge (ALJ).  Tr. 480-
99.  On May 16, 2007, the ALJ found plaintiff not disabled.  Tr.
10-19.  The Appeals Council denied plaintiff's request for review
of the ALJ's decision.  Tr. 6-9.

FACTUAL BACKGROUND

    Plaintiff alleges disability based on problems with her back
and gall bladder, brain injury, a trigger finger on her right hand,
an over-active thyroid, memory difficulties, and depression.  Tr.
73-74.  At the time of the April 6, 2007 hearing, plaintiff was
fifty-three years old.  Tr. 483.  She has a General Equivalence
Diploma (GED).  Tr. 484.  Her past relevant work is as a

2 - FINDINGS & RECOMMENDATION

1  housekeeper/cleaner and a janitor.   Tr. 495.

2  I.   Medical Evidence

3       As discussed below, the only errors plaintiff raises in this
4  action are that the ALJ improperly disregarded the opinion of
5  treating physician Dr. Curtis Hanst, M.D. and that the ALJ
6  inadequately developed the record by failing to re-contact Dr.
7  Hanst.   As such, the relevant medical evidence consists of the
8  treating physician's records and opinions.

9       Dr. Hanst saw plaintiff at Klamath Tribal Health & Family
10  Services.   Tr. 284-399, 426-453.   Although it appears he was her
11  primary care provider, other staff at the facility apparently also
12  saw and treated plaintiff over the years.   The first chart note
13  revealing any possible physical limitation is dated July 10, 1997,
14  and indicates that in November 1996, plaintiff suffered a third-
15  degree burn to the first and third fingers of her left hand and was
16  still experiencing numbness and tingling.   Tr. 357.   The provider
17  at that time, whose signature is illegible, recommended squeezing
18  a tennis ball.   Id.   The chart note also indicates that she had
19  good movement and strength, but that it might take another six to
20  twelve months for the nerves to regenerate.   Id.   A physical
21  impairments and limitations report completed by the provider on
22  that date, states that any activity which increased plaintiff's
23  heart rate or involved using her hands below her waist, would
24  increase her problems.   Tr. 358.   The provider indicated that the
25  restrictions were temporary, with a notation that the duration of
26  the paresthesia and numbness would probably continue for three
27  months.   Id.

28       On November 13, 1997, Dr. James Benjamin, M.D. saw plaintiff
3 - FINDINGS & RECOMMENDATION

1   and issued the same physical impairments and limitation report as
2   did the provider in July 1997.  Tr. 351-52.  He also indicated that
3   the problem would likely persist for three months.  Tr. 352.  He
4   further indicated on a separate chart note that her disability
5   should end December 30, 1997.  Tr. 350.

6        In January 1998, plaintiff continued to complain of pain and
7   numbness in the left hand.  Tr. 345.  Dr. Benjamin referred her to
8   occupational therapy.  Tr. 344-45.  Plaintiff received occupational
9   therapy treatment from January 1998 to July 1998.  Tr. 136-55.  At
10  discharge, plaintiff was doing "quite well," and reported that she
11  had better use of her index finger.  Tr. 136.  She also stated that
12  on the occasions when she experienced some hypersensitivity, she
13  knew what to do to decrease it.  Id.  She had also embarked on a
14  home stretching and strengthening program.  Id.  In October 1998,
15  plaintiff reported that she now had 100% range of motion in the
16  first digit of her left hand, but it still had pain from time to
17  time and felt weaker than the rest of her digits.  Tr. 336.

18       On December 17, 1998, plaintiff experienced severe pain from
19  a moderately sized gallstone.  Tr. 334.  On December 29, 1998,
20  plaintiff reported her pain as a dull ache in the right upper
21  abdominal quadrant.  Tr. 333.  She was diagnosed with mild
22  cholecystitis[1] or cholelithiasis.[2]  Id.  Although there is a chart
23  note from January 1999 regarding plaintiff's request for nutrition

24

25       [1] Inflammation of the gallbladder.  Taber's Cyclopedic
26  Medical Dictionary 279 (Clayton Thomas ed., F.A. Davis, 14th ed.
    1981).

27       [2] Presence of calculi or bilestones in the gallbladder or
28  common duct.  Taber's 280.

4 - FINDINGS & RECOMMENDATION

and diet advice for proper eating post-surgery, Tr. 332, I find no medical records of gall bladder surgery being performed.   Records from September 2000 indicate that a cholecystectomy[3] was performed at some point.   Tr. 182, 191.

In a June 26, 2000 chart note, Dr. Hanst noted that plaintiff had borderline hyperthyroidism[4] and stable hyperbilirubinemia.[5]   Tr. 324.   In June 2001, Dr. Hanst remarked that plaintiff was temporarily disabled from working due to treatments necessary for her hyperthyroid condition.   Tr. 316, 318, 319, 322.   He then assessed her as having hypothyroidism[6] on February 7, 2002, and hyperthyroidism on February 15, 2002.   Tr. 314, 315.

On May 30, 2002, Dr. Hanst indicated that plaintiff was limited to four hours of work activity per day until "we see some improvement in her thyroid parameters." Tr. 313.   He opined that she would be unable to return to full-time work until there was better control of her thyroid.   Id.   His diagnosis was untreated hyperthyroidism.   Id.

On October 17, 2002, Dr. Hanst referred to plaintiff's condition as hypothyroidism, and noted that it was severe and untreated.   Tr. 311.   Although she had attempted to start a medication regime, she discontinued it because it made her feel

---

[3]   Excision of the gallbladder.   Taber's 278.

[4]   A condition caused by excessive secretion of the thyroid glands which increase the basal metabolic rate.   Taber's 691.

[5]   Excessive amount of bilirubin in the blood.   Taber's 684.

[6]   A condition due to deficiency of the thyroid secretion, resulting in a lowered basal metabolism.   Taber's 698.

5 - FINDINGS & RECOMMENDATION

shaky.  Id.  Dr. Hanst suggested a trial of a different medication but plaintiff "continue[d] to refuse definitive treatment" and was "afraid of [] radioactive iodine and surgery" as a treatment option.  Id.  Dr. Hanst strongly recommended that she consider the radioactive iodine.  Id.  He also noted that plaintiff was aware that she would likely not qualify for permanent disability if were unwilling to participate in treatment.  Id.

In March 2003, Dr. Hanst saw plaintiff for the first time in six months.  Tr. 310.  She was three months late in returning to see him.  Id.  She stated she needed to update her work restrictions, which had limited her to four hours per day, but she raised two new problems:  a back contusion and pain in her right third "PIP" joint.[7]  Tr. 310.

On physical examination of her back, Dr. Hanst found tenderness with a focal trigger point in the left lateral paravertebral muscles at the T-10 level.  Id.  She also had more diffuse tenderness in those muscles from approximately L-2 to T-8.  Id.  There was no bony tenderness, but there was "somewhat limited" range of motion due to pain.  Id.

Her right third PIP joint had a "pop" to it but there was no synovial tenderness or thickening.  Id.  There was some bony hypertrophy consistent with arthritis.  Id.

Dr. Hanst diagnosed plaintiff with untreated hyperthyroidism with poor compliance with a regimen, degenerative joint disease of the hands, and back pain following a contusion.  Id.  He prescribed

---

[7]  Proximal interphlangeal joint.  Taber's 739, 1174.

6 - FINDINGS & RECOMMENDATION

Naprosyn[8] and Flexeril[9] for her back with refills for the Naprosyn to help with her hands.  Id.  He kept her off of any work for one week due to her back contusion.  Id.

In August 2003, Dr. Hanst noted that plaintiff's thyroid condition was "Grave's disease."  Tr. 309.  He further noted her continued non-compliance with medication.  Id.  He strongly urged her to comply with the medication.  Id.  There is no mention of any continued back pain.  Id.

On October 1, 2003, Dr. Hanst noted that plaintiff had a symptomatic history of Grave's disease[10], and while she had attempted some medication, it was unsuccessful in controlling her hyperthyroid condition and she had failed to follow up with endocrinology as planned.  Tr. 308.  She denied tachycardia or other physical systemic symptoms for her thyroid.  Id.  She also complained that her current mental status was insufficient to allow her to return to work.  Id.  She further complained of right hand pain, particularly the third PIP where she had noticed some locking.  Id.      Dr. Hanst ordered an x-ray of her digit.  Id. He remarked further as follows:

> [Plaintiff] was allowed 2 additional months on her
> physical restrictions regarding [general assistance].
> [I]n that time she was advised to schedule [follow up]
> for oblation of her thyroid, which at this point, is my
> only recommendation.  I do not believe she can continue

---

[8]  A non-steroidal anti-inflammatory drug.  www.drugs.com

[9]  A muscle relaxant used to treat muscle spasms. www.drugs.com

[10]  An exopthalmic goiter, which is a condition marked by protrusion of the eyeballs, increased heart action, enlargement of the thyroid gland, weight loss, and nervousness.  Taber's 512, 609.

7 - FINDINGS & RECOMMENDATION

1  to use her thyroid condition as a form of disability and
   it can be treated and should be at this time. . . .
2  Eleanor [Delaney] will assist [plaintiff] in the process
   of permanent disability if that is the direction that
3  [plaintiff] chooses to go but she has conditions that are
   correctable and I would like her to choose to correct
4  them.

5  Id.

6      The right hand x-ray showed some mild arthritis in the

7  interphalangeal joints with no evidence of fracture and no other

8  focal bony abnormalities identified. Tr. 278. Plaintiff received

9  treatment for her hand pain from Dr. Michael J. Casey, M.D., who

10 noted two distinct complaints: a triggering of the right ring

11 finger and a separate complaint of tenderness over the right small

12 finger at the PIP joint. Tr. 276. On physical examination, Dr.

13 Casey noted tenderness over the "A1 pulley" and over the proximal

14 phalanx of the small finger without any obvious erythema and

15 excellent motion. Id. He injected her triggering digit with

16 cortisone on October 15, 2003. Id.

17     At some point between a November 26, 2003 appointment with

18 Dr. Casey during which he recommended continuing to wait to see if

19 the triggering right finger would improve, and January 22, 2004,

20 Dr. Casey recommended that plaintiff have surgery for her trigger

21 finger. Tr. 272 (chart note by unnamed physician retained to offer

22 a second opinion regarding the proposed surgery by Dr. Casey).

23     Plaintiff had an "A1 pulley release" on April 7, 2004,

24 performed by Dr. Casey. Tr. 270. On May 10, 2004, Dr. Casey

25 reported that plaintiff had a little extension lag at the PIP

26 joint, likely from a long term trigger finger. Tr. 269. He gave

27 her some stretching exercises and instructed her to return to him

28 in one month. Id. On June 15, 2004, Dr. Casey noted that

8 - FINDINGS & RECOMMENDATION

plaintiff was doing "very well," and had full range of motion of her trigger finger with no catching.  Tr. 269.

Plaintiff saw Dr. Hanst again on August 5, 2004.  Tr. 301. She complained of pain and tension in the area of her hand surgery, with difficulty straightening it completely.  Id.  She told Dr. Hanst that she was still impaired and unable to do any job searching or work.  Id.  On physical examination, Dr. Hanst remarked that her hand showed a well-healed scar and that she was able to extend it completely.  Id.  He noted that hyperextension caused some tension of the tendon.  Id.

He noted, again, her failure to consistently take medication for her "long standing hyperthyroidism." Id.  He further noted that she had been strongly counseled on multiple occasions that the appropriate treatment was thyroid oblation.  Id.  Apparently, he convinced her to restart an oral medication for her condition, noting that she was "recalcitrant" in opting for the safest and healthiest long term solution of thyroid oblation.  Id.  He concluded his chart note by stating that her "TWAP form was completed and I did state that she was unable to work although his is based on self-assessment.  I do think that she should be able to start making progress in this area immediately.  She was advised that such progress will likely be demanded by her program." Id.

Plaintiff was seen by endocrinologist Ramona Pungan, M.D. in September 2004.  Tr. 298-99.  In the history section of the report, Dr. Pungan notes that plaintiff was found have hyperthyroidism after a blood test which was done following her complaint of feeling tired all the time.  Tr. 299.  She had no other symptoms of hyperthyroidism prior to its discovery.  Id.  Plaintiff told Dr.

9 - FINDINGS & RECOMMENDATION

Pungan that following her August 2004 visit with Dr. Hanst, she
started to take "PTU," or propylthiouracil, an oral medication to
treat her thyroid condition.   Id.   She could not tell if her
symptoms had improved, but she noted that she had felt more
irritable and more tired while on the medication.   Id.   She
reported dry skin and thin hair which had been present "for some
time now."   Id.

A January 26, 2005 chart note by Dr. Hanst states that
plaintiff had been under treatment with Dr. Pungan and had been
compliant with her medication, showing improvement in her "TSH."
Tr. 291.   Thus, Dr. Pungan felt that for the time being, oblation
was not required.   Id.   Dr. Hanst noted that plaintiff's
hyperthyroidism was now medically controlled.   Id.   He also noted
that plaintiff had brought a "Transitions To Work" limitations form
that needed to be completed, and that he did complete this with
her.   Id.

From June 2005 to January 2006, plaintiff was seen at Klamath
Tribal Health & Family Services by family nurse practitioner A.
Hughes and family nurse practitioner Darci Butcher, but not by Dr.
Hanst.   Tr. 284-89.   In June 2005, Hughes noted that plaintiff had
a dysthymic disorder which was keeping her from working.   Tr. 289.
On July 26, 2005, Hughes saw plaintiff for complaints of chronic
back pain for the previous six months.   Tr. 288.   On physical
examination, Hughes noted that plaintiff had paravertebral muscle
discomfort in the lower thoracic spine, and lumbar spine areas, but
had a full range of motion and neurovascular intact to distal
extremities.   Id.   There was no major swelling.   Id.   X-rays were
ordered.   Id.

10 - FINDINGS & RECOMMENDATION

On September 22, 2005, Butcher noted that the x-rays taken September 8, 2005, revealed an old compression deformity in the mid-thoracic spine and a little bit of degenerative changes there and in her lumbar spine.  Tr. 287; see also Tr. 362, 363.

Butcher saw plaintiff again on January 24, 2006, and noted that a November 17, 2005 thoracic spine MRI was normal.  Tr. 284; see also Tr. 361.  In response to her several complaints of pain, Butcher tried to explain that plaintiff's past injuries were most likely not the cause, but rather, it was most likely due to deconditioning and her failure to try some standard of care therapeutics for her headaches and chronic pain.  Id.

On February 10, 2006, Dr. Hanst saw plaintiff again and noted that the MRI did not show any abnormalities.  Tr. 450.  He explained that while the x-ray suggested a possible compression fracture, he "would lean towards the MRI as the definitive study." Id.  He explained to her that there was likely no history of fracture.  Id.

In March 2006, Dr. Hanst saw plaintiff for several issues. Plaintiff told him that she was completely disabled and unable to work or job search based on the back pain she was experiencing. Tr. 449.  Dr. Hanst stated that he had evaluated this previously and noted that she was awaiting SSI determination.  Id.  His physical exam was limited to an assessment of vital signs, oxygen saturation, and weight, with the rest of the physical exam deferred.  Id.  Based on the results of certain lab tests, he noted

1  that she had hyperlipidimia.[11]  Id.  The lab tests also showed a
2  normal thyroid.  Id.

3      In May 2006, plaintiff returned to Dr. Hanst to follow up on
4  her hyperlipidimia.  Tr. 446.  At that time, she had no other
5  complaints.  Id.  The physical exam consisted of only an assessment
6  of her vital signs with the remainder of the exam deferred.  Id.

7      On June 20, 2006, plaintiff was seen by podiatrist Dr. Michael
8  McCullough, D.P.M, for heel pain.  Tr. 444.  X-rays showed a normal
9  heel with no fracture or spurring.  Id.  Dr. McCullough assessed
10  plaintiff as having bilateral plantar fasciitis.  Id.  He advised
11  her to get different shoes and also recommended an injection which
12  she declined.  Id.

13      On that same date, plaintiff also saw Dr. Hanst.  Tr. 441.
14  Her lab tests showed dramatic improvement in her hyperlipidemia.
15  Id.  She reported no change in her back pain.  Id.  Her vital signs
16  were within normal limits but the remainder of any physical exam
17  was deferred.  Id.

18      Dr. Hanst completed a physical residual function capacity
19  report at this time.  Tr. 442-43.  He opined that plaintiff could
20  frequently lift or carry no more than ten pounds, could stand or
21  walk for a total of less than two hours in an eight-hour day, and
22  had to periodically alternate sitting and standing to relieve pain
23  or discomfort.  Tr. 442.  He further opined that while she had no
24  limitations on pushing or pulling, she could never climb (ramp,
25  stairs, ladder, rope, or scaffolds), balance, stoop, kneel, crouch,

26  _____

27      [11]  Elevated fats in the bloodstream and the medical term
   for high cholesterol.  Taber's 687;
28  http://www.nlm.nih.gov/medlineplus/ency/article/000403.htm

or crawl.  Id.  He indicated that she could occasionally reach in all directions, but could frequently handle, finger, or feel.  Tr. 443.  She had no environmental limitations.  Id.  As diagnoses, Dr. Hanst stated that she had chronic back pain, depression, and plantar fasciitis.  Id.  He listed her prognosis as poor and noted that the condition was permanent.  Id.  He also wrote that plaintiff stated she was unable to work or job search due to pain. Id.

On August 15, 2006, Dr. Hanst examined plaintiff again.  She told him that though she had been unable to work, she was interested in vocational rehabilitation.  Tr. 438.  He noted that she had some back pain, mostly in her lower back, sometimes in her upper back, with no radicular symptoms.  Id.  He further noted that she took no medication for the pain.  Id.  Plaintiff remarked to Dr. Hanst that she had increased depressive symptoms, but there is no description of what symptoms she was experiencing.  Id.  He restarted her on Effexor.  Id.

On August 15, 2006, Dr. McCullough injected plaintiff's feet for her continued pain due to plantar fasciitis.  Tr. 437.  On September 19, 2006, in a follow-up appointment with Dr. McCullough, plaintiff reported that her heel pain was much better, the injections helped, and that she had obtained new shoes.  Tr. 436.

On September 28, 2006, Dr. Hanst noted that plaintiff was requesting medication for back pain.  Tr. 433.  He was hesitant to prescribe an opiod medication, but plaintiff reported that Naprosyn did not work previously.  Id.  No physical examination other than an assessment of vital signs, was performed.  Id.  Dr. Hanst

13 - FINDINGS & RECOMMENDATION

1  prescribed Voltaren[12] as need for back pain, and continued a
2  prescription for Flexeril as needed.  Id.

3      On that same date, Dr. Hanst completed another physical
4  residual function capacity report.  His assessment was almost
5  identical to the one he completed in June 2006, except that he now
6  indicated that she could occasionally climb a ramp or stairs.  Tr.
7  434.  He listed diagnoses of chronic back pain, chronic plantar
8  fasciitis, depression, and hyperthyroidism.  Tr. 435.  He again
9  assessed her prognosis as poor and her condition as permanent.  Id.
10  He also again noted that plaintiff stated she was unable to work or
11  job search due to pain.  Id.

12      Although plaintiff received the prescription for Voltaren on
13  September 28, 2006, she did not pick up the medication until her
14  next visit with Dr. Hanst on October 17, 2006.  Tr. 430.  Plaintiff
15  also reported that her foot was improving.  Id.

16      On January 20, 2007, plaintiff reported to Dr. Hanst that her
17  back pain continued and she had developed right elbow pain.  Tr.
18  427.  Dr. Hanst noted that her back showed limited range of motion
19  with some focal paravertebral muscle tenderness, although no actual
20  trigger points were identified.  Id.  Her right elbow revealed
21  minimal tenderness over the lateral epicondyle, but no effusion or
22  other abnormality was noted.  Id.  Dr. Hanst's impressions at this
23  visit were hypothyroidism and hyperlipidemia.  Id.  He did not
24  include previous assessments of plantar fasciitis, depression, or
25  back pain in his impression list as he had previously done.  Id.
26  Plaintiff was instructed to ice her elbow.  Id.

27  _____

28      [12]  A non-steroidal anti-inflammatory drug.  www.drugs.com
14 - FINDINGS & RECOMMENDATION

1    In his chart note, Dr. Hanst stated that he "re-work[ed] her
2    functional capacity report for social services," but that it was
3    "unchanged." Id. He noted that he had "previously recommended she
4    should be considered permanently disabled as I doubt she will work
5    again." Id.

6    He also completed another physical residual function capacity
7    report on January 30, 2007, and it was unchanged from the one he
8    completed in September 2006, except this time he omitted depression
9    from the diagnosis list, and included only chronic back pain,
10   chronic plantar fasciitis, and hyperthyroidism.  Tr. 428-29.

11   II.  Plaintiff's Testimony

12   At the hearing, plaintiff testified that she was unable to
13   work because she cannot walk or sit for more than thirty minutes
14   without experiencing back pain.  Tr. 486.  She described her daily
15   routine as getting out of bed at 9:00 or 10:00 a.m., and making her
16   own breakfast of tea and toast.  Tr. 486-87.  In response to the
17   question of what she did all day long, plaintiff responded that
18   lately, she mostly did "business" and sometimes went to the store.
19   Tr. 487.  She did her own shopping, but would get a ride with a
20   neighbor if she had to buy "heavy stuff." Id. She sometimes stays
21   home because of back pain, and lays down most of the day when the
22   pain is bad, which is a couple of times each week.  Id. She noted
23   that she took a muscle relaxer twice per day.  Tr. 486.

24   Plaintiff described her pain as "daily, all day, every day,"
25   and indicated that it was a sharp pain, mostly on the right side.
26   Tr. 488.  Plaintiff indicated that depression was part of her
27   problem and that she isolates herself.  Id. She stated that her
28   memory was poor, she had a hard time finishing tasks, and

15 - FINDINGS & RECOMMENDATION

1    socializes little.  Tr. 489-91.

2    III.  Lay Witness Testimony

3        Plaintiff's neighbor Peggy Wells testified at the hearing.
4    Wells sees plaintiff three or four times per week.  Tr. 493.  At
5    the time of the April 6, 2007 hearing, Wells had known plaintiff
6    for about two years.  Id.  In the time she had known plaintiff,
7    plaintiff's ability to "do things" had deteriorated.  Id.  Wells
8    noted as an example that when they went grocery shopping, plaintiff
9    got tired and started to limp more.  Id.  She also noted that
10   plaintiff had trouble getting up and down from the couch and being
11   able to sit very long.  Tr. 493-94.

12       Wells remarked that plaintiff was forgetful and had a hard
13   time completing a task.  Id.  Wells noted that plaintiff could not
14   keep her mind on the same project very long.  Id.

15   IV.  Vocational Expert Testimony

16        Vocational Expert (VE) Frances Summers testified at the
17   hearing.  Tr. 494-98.  She testified that plaintiff's past relevant
18   work was as a housekeeper/cleaner and janitor.  Tr. 495.

19       The ALJ presented the following hypothetical to the VE:  a
20   fifty-three year old person with a GED and plaintiff's past
21   relevant work, limited to simple routine tasks and instructions
22   with only occasional public contact.  Id.  In response, the VE
23   stated that such a person could perform his or her past relevant
24   work.  Id.

25       The ALJ then added additional limitations of lifting twenty
26   pounds occasionally, ten pounds frequently, sitting for six hours
27   out of an eight-hour day, standing or walking for six hours out of
28   an eight-hour day, with a sit-stand option and a change of

16 - FINDINGS & RECOMMENDATION

1  positions every thirty to sixty minutes.  Tr. 495-96.  The ALJ
2  added  occasional  balancing,  stooping,  kneeling,  crouching,
3  crawling, and overhead reaching.  Tr. 496.  The person would also
4  be limited to simple routine tasks and instructions with occasional
5  public contact.  Id.

6      In response, the VE stated that neither of the past relevant
7  work jobs would allow for a sit-stand option so the prior work
8  would  not  be  suitable  for  such  an  individual.   But,  the  VE
9  identified several other jobs in the national or regional economy
10  that such a person could perform.  Id.

11     The ALJ posed a third hypothetical to the VE which included
12  lifting less than ten pounds frequently and less than ten pounds
13  occasionally,  stand  or  walk  for  less  than  two  hours  out  of  an
14  eight-hour day, but with unlimited sitting.  Tr. 497.  The ALJ also
15  included  a  sit-stand  option  with  the  change  of  positions  every
16  thirty  to  sixty  minutes,  with  no  balancing,  stooping,  kneeling,
17  crouching, and crawling, and only occasional reaching in front and
18  overhead.  Id.  Finally, the ALJ continued the limitation of simple
19  routine tasks and instructions and occasional public contact.  Id.
20  In response, the VE stated there were no jobs that such a person
21  could perform.  Id.

22                      THE ALJ'S DECISION

23     The ALJ first found that plaintiff had met the insured status
24  requirements for DIB through June 30, 1993.  Tr. 15.  He then
25  concluded that she had not engaged in substantial gainful activity
26  since her alleged onset date of October 15, 1990.  Id.

27     The ALJ found that plaintiff suffered from severe impairments
28  of  a  depressive  disorder,  a  general  anxiety  disorder,  and  a

17 - FINDINGS & RECOMMENDATION

personality disorder NOS. Id. However, he concluded that plaintiff's impairments, either singly or in combination, did not meet or equal a listed impairment. Tr. 16.

The ALJ determined that plaintiff had a residual functional capacity (RFC) without physical restrictions. Id. Although she was limited to simple, routine tasks and instructions, and only occasional public contact, there were no other limitations. Id.

In assessing her RFC, the ALJ concluded that while plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms was not entirely credible. Tr. 17.

As for her psychological symptoms, the ALJ stated that there was no evidence of significant mental limitations through most of the alleged time period. Id. He discussed a February 2004 examination by Gregory Cole, Ph.D., and gave it a fair amount of weight. Id. Dr. Cole diagnosed depression and a personality disorder and thought plaintiff could perform simple routines tasks with no other significant problems. Id. The ALJ remarked on other evidence of an improving global assessment of functioning (GAF) score, and stated that these were consistent with his RFC. Id.

The ALJ also found various reports showing that plaintiff had some symptoms and limitations, but not to the point of disability. Tr. 18. He concluded that plaintiff's own testimony supported this conclusion because she stated that she managed household chores and shopping, but tended to avoid the public. Id.

As for her physical limitations, the ALJ acknowledged plaintiff's report of severe, chronic back pain, allegedly limiting

18 - FINDINGS & RECOMMENDATION

1   her ability to stand or sit for prolonged times.   Tr. 16.   He

2   further noted her report of a "litany" of aches, pains, and

3   fatigue, with limited physical ability. However, he discounted her

4   statements as not entirely credible.   Id.

5       He noted that plaintiff's left hand burns in 1996 had been

6   treated and she had returned to normal levels of functioning.   Id.

7   He noted her history of treatment for thyroid problems, but found

8   no particular limitations as result.   Id.   He found that her

9   trigger finger was adequately repaired with restoration of

10  function.   Id.   He cited to the records from Dr. Hanst's office

11  generally, and stated that her ongoing medical examinations had not

12  shown significant functional limitations from her impairments.   Id.

13      The ALJ directly addressed Dr. Hanst's numerous reports that

14  plaintiff was limited to less than sedentary work.   Id.   The ALJ

15  concluded, however, that Dr. Hanst's assessments were contradicted

16  by plaintiff's mild examination findings and the fact that Dr.

17  Hanst also frequently deferred any physical examination.   Id.   He

18  give scant weight to Dr. Hanst's conclusions.   Id.

19      The ALJ then stated that while other impairments are mentioned

20  in the record from time to time, they were either transient or had

21  not imposed significant functional limitations.   Id.   Thus, he

22  concluded that she did not have a severe physical impairment.   Id.

23      Based on the RFC, the ALJ then relied on the VE's testimony to

24  conclude that plaintiff was able to return to her past relevant

25  work as a housekeeper/cleaner or janitor.   Tr. 18.   Thus, he

26  determined that she was not disabled.   Id.

27              STANDARD OF REVIEW & SEQUENTIAL EVALUATION

28      A claimant is disabled if unable to "engage in any substantial

19 - FINDINGS & RECOMMENDATION

gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).    Disability claims are evaluated according to a five-step procedure. Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991).    The claimant bears the burden of proving disability.    Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989).    First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).    In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§ 404.1520(c), 416.920(c).    If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; see 20 C.F.R. §§ 404.1520(d), 416.920(d).    If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e).    If the claimant can, he is not disabled.    If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work.    Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§

20 - FINDINGS & RECOMMENDATION

1  404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets its
2  burden and proves that the claimant is able to perform other work
3  which exists in the national economy, he is not disabled.  20
4  C.F.R. §§ 404.1566, 416.966.

5      The court may set aside the Commissioner's denial of benefits
6  only when the Commissioner's findings are based on legal error or
7  are not supported by substantial evidence in the record as a whole.
8  Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a
9  mere scintilla," but "less than a preponderance."  Id.  It means
10 such relevant evidence as a reasonable mind might accept as
11 adequate to support a conclusion.  Id.

12                              DISCUSSION

13     Plaintiff first argues that the ALJ failed to accord adequate
14 weight to Dr. Hanst's opinion and failed to provide adequate
15 reasons for the rejection of his opinion.  Although plaintiff does
16 not identify the opinion at issue, I presume, based on the record,
17 that it is Dr. Hanst's several opinions that plaintiff is capable
18 of less than sedentary work, along with his physical residual
19 function limitations noted in the several physical residual
20 function capacity reports he completed.

21     The opinion of a treating physician "is not binding on an ALJ
22 with respect to the existence of an impairment or the ultimate
23 determination of disability." Tonapetyan v. Halter, 242 F.3d 1144,
24 1148 (9th Cir. 2001).  Thus, the ALJ properly disregarded any
25 conclusory opinion by Dr. Hanst that plaintiff was disabled.

26     In regard to other opinions offered by Dr. Hanst regarding
27 plaintiff's limitations,

28     [t]o reject an uncontradicted opinion of a treating or
   21 - FINDINGS & RECOMMENDATION

1
2
3
4

> examining doctor, an ALJ must state clear and convincing
> reasons that are supported by substantial evidence. . .
> . If a treating or examining doctor's opinion is
> contradicted by another doctor's opinion, an ALJ may only
> reject it by providing specific and legitimate reasons
> that are supported by substantial evidence.

Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation

omitted).

Here, the ALJ rejected Dr. Hanst's opinions because his

assessment was contradicted by the mild examination findings and

because Dr. Hanst frequently deferred physical examination.  As

seen from the recitation of the medical evidence above, e.g., supra

at pp. 6, 9-14, the ALJ's conclusion is supported by clear and

convincing evidence in the record.

When a physical examination of plaintiff's back was actually

conducted, it generally revealed some muscle discomfort but either

little or no impact on range of motion and no neurovascular

impairment.  E.g., Tr. 288 (July 26, 2005 physical examination upon

complaint of back pain revealed paravertebral muscle discomfort in

the lower thoracic and lumbar spine, but plaintiff had full range

of motion with "neurovascular intact to distal extremities"); Tr.

310 (March 20, 2003 physical examination upon complaint of back

contusion showed tenderness and somewhat limited range of motion

due to pain but "neuro intact"); see also Tr. 427 (January 20, 2007

physical examination after complaint of ongoing back pain revealed

tenderness and limited range of motion, with no actual trigger

points).

X-rays taken in September 2005 revealed only mild to moderate

degenerative changes in the lower and mid-thoracic areas and only

mild changes in the lumbar area.  Tr. 362-63.  Butcher reviewed the

22 - FINDINGS & RECOMMENDATION

1   x-rays with plaintiff soon after they were taken, and then told
2   plaintiff in January 2006, that her past injuries were likely not
3   the cause of her current pain problems which were most likely due
4   to deconditioning and plaintiff's failure to attempt "standard of
5   care therapeutics" for her pain.  Tr. 284, 287.

6       In February 2006, Dr. Hanst noted that although the September
7   2005 spinal x-rays had revealed a possible compression fracture in
8   her thoracic spine, a later MRI performed in November 2005 revealed
9   no abnormality.  Tr. 450.  The MRI was the definitive study
10  according to Dr. Hanst.  Id.  Additionally, for most of the period
11  of treatment with Dr. Hanst, plaintiff received no medication for
12  her back pain, which further reinforces the mild examination
13  findings revealed in the records from Dr. Hanst's office.

14      The ALJ may reject a treating physician's limitations
15  assessment when it is unsupported by the treating physician's notes
16  and observations.  Bayliss, 427 F.3d at 1216 (discrepancy between
17  treating physician's notes and recorded observations on the one
18  hand and assessment of the claimant's ability to stand and walk on
19  the other, was a clear and convincing reason to reject the
20  physician's opinion regarding standing and walking); Connett v.
21  Barnhart, 340 F.3d 871, 874-75 (9th Cir. 2003) (ALJ properly
22  rejected opinion of treating physician when opinion unsupported by
23  physician's own treatment notes).  Here, the medical records from
24  Dr. Hanst's office do not support his conclusions regarding
25  plaintiff's limitations.  The ALJ properly rejected Dr. Hanst's
26  opinion.

27      Plaintiff separately argues that the ALJ erred by failing to
28  contact Dr. Hanst for additional information.  I disagree.

23 - FINDINGS & RECOMMENDATION

1    Where the record is ambiguous, it is incumbent on the ALJ to
2 pursue the source of the opinion and obtain clarification about the
3 assessment.  20 C.F.R. §§ 404.1512(e), 416.912(e).  The duty exists
4 even when a claimant is represented by counsel.  <u>Tonapetyan</u>, 242
5 F.3d at 1150.

6    The fact that the medical evidence does not support Dr.
7 Hanst's opinion does not make his opinion.  It is not that the
8 record is insufficient or unclear.  It simply does not support his
9 assessment.  The ALJ was not required to re-contact Dr. Hanst.  <u>See</u>
10 <u>Bayliss</u>, 427 F.3d at 1217 (ALJ had no duty to re-contact doctors
11 when evidence adequate to make a determination regarding
12 disability; duty to re-contact is triggered only when the doctor's
13 report is ambiguous or insufficient to make a disability
14 determination); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958 (9th Cir.
15 2002) (ALJ's rejection of a report did not trigger duty to re-
16 contact treating practitioner when the report was not inadequate to
17 make a disability determination but rather was rejected because it
18 was based on subjective information).

19                          CONCLUSION
20    The Commissioner's decision should be affirmed.
21                      SCHEDULING ORDER
22    The above Findings and Recommendation will be referred to a
23 United States District Judge for review.  Objections, if any, are
24 due September 29, 2008.  If no objections are filed, review of the
25 Findings and Recommendation will go under advisement on that date.
26 / / /
27 / / /
28 / / /

24 - FINDINGS & RECOMMENDATION

If objections are filed, a response to the objections is due October 14, 2008, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this  12th   day of  September  , 2008.


/s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge